## EXCELSIOR NEEDLE CO. v. MORSE-KEEFER CYCLE-SUPPLY CO.

### (Circuit Court, D. Connecticut.  November 4, 1899.)

1. PATENTS—INVENTION—WIRE-SWAGING MACHINES.

  The Dayton patent, No. 474,548, for a swaging machine, which is especially adapted, and largely used, for the manufacture of double-butt swaged bicycle spoke blanks, is void for anticipation and lack of patentable invention; the means broadly shown in the first claim having long been generally known and applied for analogous purposes, and the detail construction covered by claims 2 and 3 having been shown in the Brown and Sharpe machine for making screws.

2. SAME—INFRINGEMENT.

  The Dayton patent, No. 492,576, for a swaging machine acting in co-operation with an automatic feed to produce double-butt bicycle spoke blanks, as to the first four claims, covering the broad combination of swager and automatic feed, and claim 6, was anticipated by the Kaiser patent, No. 33,707, for a needle machine, and by the Breedon machine for making straight wire blanks; the mechanism of such machines having merely been combined in the Dayton machine, and modified to adapt it to making the longer spoke blanks, which involved mechanical skill only.  Claims 5, 8, and 9, in so far as they cover a variable connection between the cutter plate and pinchers, involve invention; also *held* infringed by machines made under the Morse patent, No. 588,648.

This was a suit in equity by the Excelsior Needle Company against the Morse-Keefer Cycle-Supply Company for infringement of certain patents.

Chapman & Hall and H. A. Seymour, for complainant.

Alfred Wilkinson, for defendant.

TOWNSEND, District Judge.  Final hearing on usual bill and answer raising questions of validity and infringement of complainant's patents No. 474,548, granted May 10, 1892, and No. 492,576, granted February 28, 1893, to William H. Dayton for swaging machines.

In the discussion of the questions presented, the following contentions of complainant's counsel are proved:  The inventions of the Dayton patents in suit relate to improvements in machines for swaging wire, which are especially adapted to the manufacture of double-butt swaged bicycle spoke blanks.  These blanks were a great improvement on the prior art, were promptly adopted by the trade, and have gone into almost universal use, and Dayton's machines were the first to produce said improved spoke blanks.  The defendant's machine infringes the claims of the first patent.  The difference in construction of tappets is immaterial.

The following contentions of defendant's counsel are proved:  The first patent makes no mention of spokes.  Both patents are for wire-swaging machines.  The swaging of wire to make spoke blanks is exactly the same operation as the swaging to make needle blanks, and these machines perform only one operation in the manufacture of the double-butt spokes, which are not a patented article, and in a prior patent this patentee (Dayton) had shown a similar way to swage blanks for needles.  The defendant makes its machines under patent No. 588,648, granted to A. J. Morse, August 24, 1897.

Rotary swaging machines for reducing wire were old. Prior to the patents in suit, the art, as illustrated by Hopson and Brooks and Dayton and other patents, showed such machines, consisting generally of a stationary ring or head provided with tappets, and inclosing a circular rotary head, in a cross groove of which were swaging dies or die blocks. This rotary head is mounted on a revolving shaft, which, being rotated at a speed of several hundred revolutions per minute, causes the dies to be thrown outward by centrifugal force, and, as they impinge on the tappets, they are driven rapidly inward against the wire. The improvement covered by the first patent in suit, as claimed by Dayton, consisted in inserting longitudinally adjustable wedges between the dies and die blocks, and constructing the said dies and blocks with inclined faces to fit the wedges, and then connecting said wedges with a longitudinally adjustable tube, so that, when the narrowest portion of the wedges is between the blocks and dies, the dies will be thrown radially so far outward as to let the wire pass through without being swaged, but, when the wedges are forced back or inwardly by the movement of the tube, the swaging operation is continued; that is, the swaging is interrupted without interfering with the operation of the machine.

The single question on this branch of the case is whether this was the patentable invention of Dayton.

The claims are as follows:

"(1) The combination, with the swaging dies and means for closing the same, of inclined surfaces, and mechanism for moving the inclines during the action of the dies, for causing the dies to perform the swaging operation, when either nearer together or farther apart, substantially as set forth.

"(2) The combination, with the swaging dies and the revolving shaft and head carrying the same, of wedges, means for moving the wedges endwise during the swaging operation, and die-actuating mechanism controlled in its action on the dies by the wedges, substantially as set forth.

"(3) The combination, with the revolving shaft and its head, of dies and die blocks, and mechanism for closing the dies, and wedges intervening between the dies and the die blocks for varying the action of the dies, and the adjusting tube within the revolving shaft, and the connections to the wedges for moving the same, substantially as set forth."

Dies with inclined surfaces were old. The Peck patents, Nos. 428,519 and 428,572, of May 20, 1890, for swaging machines, show dies secured on the end of a rotating tube, and so engaging, by means of inclined surfaces, with tappets having inclined surfaces, that the dies were moved inwardly or outwardly, so as to swage when near together or far apart, without interrupting the action of the machine. Complainant cannot successfully meet this proof. It is true these are paper patents, but that fact does not remove them from consideration as part of the prior art, where, as in this case, they disclose the alleged invention. The specification of said patent No. 428,519 describes, and one claim covers specifically, the combination of "means for reciprocating the die-holding head to open and close the dies, and means for automatically feeding the wire between the open dies." It is true that the Peck machine was designed to be operated in connection with a complicated and clumsy automatic contrivance. But it required no invention to

strip off this automatic device, or to move said tube and wedges longitudinally by a forked lever, as was suggested in one of Dayton's patents. John N. B. Briggs v. Ice Co., 8 C. C. A. 480, 60 Fed. 87.

Complainant relies on the fact that Peck does not show the wedges and tube, which it contends are the fourth element of the first claim of the first patent in suit, and which are specifically covered in the second and third claims. But such wedges were well known in the prior art of swaging machines, as shown by the Miller and Cochrane patents, and in gripping machines, as shown by the Brown patent and machine. And the earlier Dayton patent, No. 268,874, and the later Dayton patents, Nos. 492,573 and 492,574, show the construction covered by this first claim, and the construction of the two latter patents is substantially identical, as to said fourth element, with that shown in the Peck patents.

The correctness of these conclusions is supported by the following extracts from the able and exhaustive brief of complainant's counsel. He says, speaking of the Peck machine, as follows:

"When the driving shafts, dies, and feeding rolls are moved forwardly, the dies are opened by their springs, and the feed rolls are actuated, and caused to feed the wire through them a short distance into and between the dies. When the parts are reciprocated in the opposite direction, the dies commence to operate on the wire; and, as the dies are gradually forced towards each other, the force of their blows grows harder and harder, until they reach the limit of their inward movement, when their movement is reversed, and they are gradually moved in the opposite direction, which causes their blows to become lighter and lighter, until the limit of their outward travel has been reached, and then the feeding mechanism operates to feed another short section of wire to the dies, which is then reduced in the same manner."

He then adds:

"The defendant may possibly contend that the Peck patents anticipate the first claim, in view of the testimony of Mr. Serrell, complainant's expert witness, that the third element of the first claim, viz. 'inclined surfaces,' is broad enough in terms to cover and include such a construction and arrangement of inclined dies and rollers as is shown in the Dayton patents, Nos. 492,573 and 492,574, of February 28, 1893, by arguing that such construction and arrangement is the same as that shown in the Peck patents."

In order to swage a double-butt blank in the Peck machine, it would only have been necessary to run the wire through clear, far enough for the enlarged end, and then push back the inclined surfaces so as to bring the dies together, and swage. It is clear that the broad first claim is anticipated.

If it were necessary to the decision of the question of anticipation of the first claim, it could be shown that complainant's expert, having asserted that defendant's Morse patent infringed said wedges or inclined surfaces of said first claim, on cross-examination admitted that the Morse wedges were substantially similar to those in the prior swaging-machine patent to Hendey, No. 439,952. Knapp v. Morss, 150 U. S. 228, 14 Sup. Ct. 81.

Anticipation of the details of construction covered by the second claim is more doubtful, except by reference to the Brown-Sharpe patent and machine for manufacturing screws. The following

statement of defendant's expert as to this patent and machine is abundantly proved:

"In the Brown & Sharpe machine, for many years prior to 1885 in practical use, and in the Brown patent, No. 51,257, November 28, 1865, we have Dayton's exact wedges, arranged and operated in exactly the same way; that is, a rotating head, operated by a tubular shaft, a second tube within the shaft, wedges elastically, and not rigidly, secured to the end of the tube, and means for moving said tube and wedges longitudinally while the whole mechanism is rotating, to force the dies nearer together or the reverse. To be sure, this is a gripping, and not a swaging, machine; but the wedges, their arrangement, function, operating parts, even the form of the parts, are exactly those of Dayton, and meet exactly the details specified in his claims 2 and 3. All Dayton had to do was to appropriate these identical parts."

And, although the grip function of a rotary clutch device is unlike the lever beating of the rotary swager, yet the art is, in a certain sense, analogous; for one butt of the bicycle spoke blank becomes a screw. But because this patent appears to owe its prominence, not to the inventive faculty of the patentee, but to the development of the bicycle industry, and because the means therein broadly shown had long been generally known and applied for analogous purposes, and because, in view of the prior art, the question as to the presence of invention in the new details of said second and third claims is doubtful, and because the Brown and Sharpe patent and machine show the identical detail construction covered by said second and third claims, they cannot be sustained. It does not appear from the briefs or arguments of counsel that any material distinction is drawn between said two claims.

The second patent in suit, No. 492,576, issued to Dayton, February 28, 1893, is for a swaging machine, acting, in co-operation with an automatic feed, to produce double-butt blanks. It is claimed and proved that defendant infringes all of the nine claims of said patent except the seventh. Said claims are as follows:

"(1) The combination, with the swaging mechanism, of pinchers for grasping the article to be swaged, mechanism for giving motion to the pinchers to draw the article through between the swaging dies, and a holding clamp for holding the article operated upon, and mechanism for opening the pinchers, and returning them to take a fresh hold for drawing through another length, substantially as set forth.

"(2) The combination, in a swaging machine, of dies for effecting the swaging, mechanism for actuating such dies, pinchers for holding the article to be acted upon, mechanism for opening and closing the pinchers, and moving them longitudinally for drawing the article to be swaged through between the dies, substantially as set forth.

"(3) The combination, with rotary swaging dies and mechanism for opening and closing the same, of pinchers for grasping the article to be acted upon, and mechanism for moving the pinchers, and drawing the article along between the swaging dies, a clamp for holding the article when the pinchers are opened, and a cutter and mechanism for actuating the same, to separate the swaged article from the wire or stock, substantially as set forth.

"(4) The combination, in a swaging machine, of swaging dies, rotary mechanism for actuating such dies, a moving wedge or backing for varying the closing of the dies, pinchers and mechanism for opening and closing the same, and for moving the pinchers longitudinally for drawing the article to be swaged along between the dies, a clamp for holding the material when the pinchers are opened, and a cutter for separating the swaged article, substantially as set forth.

"(5) The combination, with swaging dies, of pinchers, mechanism for opening and closing the same, and for moving them longitudinally, and carrying the article longitudinally between the swaging dies, a cutter for separating the swaged article, and a connection between the cutter and the pinchers, whereby the cutter is brought into position by the movement of the pinchers, substantially as set forth.

"(6) The combination, in a machine for swaging wire spokes, of revolving swaging dies, and mechanism for moving and regulating the action of said dies, pinchers and mechanism for opening and closing the same, a cam and variable lever mechanism for regulating the longitudinal movement given to the pinchers, and varying the length of the spoke, substantially as set forth."

"(8) The combination, with the swaging mechanism, of the revolving shaft. through which the wire to be swaged passes, and which shaft carries the swaging mechanism, pinchers and means for opening and closing the same to grasp or relieve the wire, a cam and intervening connections to the pinchers for giving motion to such pinchers to move the wire between the swaging dies, a cutter plate and cutter movably supported upon the machine, and a variable connection between the cutter plate and the pinchers for determining the position of the cutter, and mechanism for giving motion to the cutter, substantially as set forth.

"(9) The combination, with the swaging mechanism, of the revolving shaft through which the wire to be swaged passes, and which shaft carries the swaging mechanism, pinchers and means for opening and closing the same to grasp or relieve the wire, a cam and intervening connections to the pinchers for giving motion to such pinchers to move the wire between the swaging dies, a cutter plate and cutter movably supported upon the machine, and a variable connection between the cutter plate and the pinchers for determining the position of the cutter, mechanism for giving motion to the cutter, and a clamp for holding the wire during the return movement of the pinchers, substantially as set forth."

### The specification states as follows:

"In carrying out this invention, any suitable swaging apparatus may be made use of, such, for instance, as that represented in letters patent No. 474,543, granted to me May 10, 1892, and the wire as fed into the machine is preferably passed through a straightener, and the longitudinal movement is given to the wire by pinchers that grasp the partially or entirely finished blank, and draw the same along, together with the wire that is being swaged, and the wire is then held in a stationary position, while the pinchers are opened and returned to the point of beginning to take a fresh hold, and the completed article is cut off, and drops away from the machine."

This arrangement of devices is broadly covered by the first four claims.

The Kaiser patent, No. 33,707, of 1861, for a needle machine, and the Breedon machine, in use for the past 15 years at Amsterdam, N. Y., for making straight wire blanks, show substantially all the claimed elements, arranged in the same way and operating for the same purpose. Complainant, comparing Kaiser and Dayton, contends as follows:

(1) "Not an element of the sawing mechanism of Kaiser is appropriated in the swaging mechanism of Dayton."

But this is immaterial, for Dayton says he only refers to "any suitable swaging apparatus."

(2) The Dayton pinchers are heavy, strong, and positively actuated; the Kaiser nippers are closed by a spring.

This is a mere mechanical difference, especially in view of Breedon.

(3) The third element of the Dayton patent is mechanism for giving motion to the pinchers to draw the article through, and, while

Dayton gives a range of movement of 12 inches, Kaiser gives only about 2 inches.

The mechanism of Kaiser and Breedon is strikingly like that of Dayton, and, while in Breedon means are shown for varying the range of movement, it is only a matter of mechanical modification of cams to accomplish this result on either machine.

(4) The fourth element is "a holding clamp." Kaiser shows nippers.

The Breedon machine shows a clamp. The only objection suggested by complainant is that the Kaiser nipper would indent the spokes. The Breedon clamp works in the same way as the clamp of the patent in suit.

(5) The fifth element is "mechanism for opening the pinchers and returning them." Kaiser says: "The jaws are of such form that, when drawn towards the circular saws, they open of themselves, and glide over the needle wire," etc.

Breedon shows such mechanism in detail. Complainant's expert admits that every element of the first claim, except the old Breedon swager, is found in Kaiser.

Complainant's position is that the cam-faced clamp would have to be thrown away, and pinchers like the Dayton machine substituted therefor, "in order to secure a firmer grasp, and the mechanism for actuating the Breedon clamp could not be used in a spoke machine which required means for positively opening and closing the pinchers and reciprocating them throughout the distance of twelve inches." The question, therefore, is presented whether it required invention to adapt the existing needle and blank machines to the making of spoke blanks. It is unnecessary to discuss the well-settled principles of law applicable to this question. This case is a striking illustration of the inventive ingenuity of the patent solicitor rather than of the patentee, and of the reflected light which a new discovery or new art sheds upon details of construction. This patent covers any old swaging machine attached to any old automatic feed machine, so modified as to time its operations to a long piece of wire instead of a short one. Can it be doubted that, if the skilled mechanics in this needle factory had been called on to increase the length of their needles, or to grip them more firmly, and to time the feed accordingly, they would have adjusted the devices so as to have greater range of movement, or would have substituted a clamp or a pincher, or would have altered the shape and relations of the familiar cam-feeding devices? Such improvements would naturally follow in the development of the art. They would have found a considerable capacity for adjustment provided for in Breedon, and an elongated cam construction in Kaiser, pregnant in suggestions of adaptation such as is shown in Dayton's toe. Nor would these adaptations secure a novel result; for the bicycle blank, as to the operation of this patent, is only a larger needle blank. It is believed that no case can be found where a patent has been sustained for a mere change in size or degree.

The foregoing discussion relates to the first four claims for the broad combination of swager and automatic feed. The sixth claim

merely adds a cam and variable lever mechanism, which is sufficiently disclosed by Breedon. The fifth, eighth, and ninth claims cover, inter alia, the specific construction of "a variable connection between the cutter plate and pinchers for determining the position of the cutter." This connection is not found in the prior art, and involved invention. Defendant claims that it does not infringe, because it alleges that its cutter is different in construction, arrangement, and operation. In the second patent in suit the cutter and pinchers are mounted on separate carriages, connected by a rod. The pincher carriage moves longitudinally backward until it strikes and pushes back the cutter carrier, but when the pincher carriage moves forward it does not drag the cutter carriage until after it has progressed a sufficient distance to permit a nut on said rod to engage the cutter carriage. The cutter and pinchers are closed by different connections, distinct from each other.

Defendant's machine is built in accordance with the specifications of the Morse patent, as already stated. In its machine the cutters and pinchers are mounted on the same carriage, and are operated by the same mechanism, and the distance between them after they have once been adjusted is constant. Defendant, therefore, contends that its connection is not "variable." But it is variable in the sense of being adjustable, and it is only in this functional sense of "adjustable" that the word "variable" is used in said claims. I think this is a mere difference of terms; that it is unimportant; that one is first varied by adjustment for operation, while the other is varied during its operation to produce the same result.

That Morse was in complainant's employ, and left it, and became connected with the defendant company, and tried to secure a patent on various claims which were rejected on Dayton; that defendant claims to have submitted its machine and patents to the present commissioner of patents, and to have obtained an opinion from him that they did not infringe; that defendant has cut prices, and seriously interfered with complainant's business,—might have some bearing on one or the other side of the equities of this case, if they involved merely a question between the parties hereto. But the defense of want of patentable invention in a patent operates, not merely to exonerate the defendant, but to relieve the public from an asserted monopoly (Haughey v. Lee, 151 U. S. 285, 14 Sup. Ct. 331); and therefore the case has been decided upon the evidence as to patentable novelty.

Undue prominence has been given to the evidence as to increased sales of unpatented double-butt spokes, when the fact is that said increase is chiefly due to the enormous growth of the bicycle industry.

A decree may be entered for an injunction and an accounting as to claims 5, 8, and 9 of patent No. 492,576, and dismissing the bill as to the other claims of said patent, and as to patent No. 474,548.